IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

CHRISTINA LINDLEY                                                    PLAINTIFF

v.                                          CIVIL ACTION NO. 1:23-CV-151-SA-DAS

NORTH MISSISSIPPI MEDICAL CENTER, INC.                              DEFENDANT

ORDER AND MEMORANDUM OPINION

On October 31, 2023, Christina Lindley initiated this lawsuit by filing her Complaint [1] against North Mississippi Medical Center, Inc. ("NMMC"). Lindley contends that NMMC's termination of her employment violated her rights under the FMLA and ADA. Now before the Court is NMMC's Motion for Summary Judgment [48]. The Court, having reviewed the parties' respective filings and the applicable authorities, is prepared to rule.

*Relevant Background*

Prior to her termination, Lindley was employed as a surgical technician at NMMC's Retina Center in Tupelo, Mississippi. She held that position from April 2018 until she was terminated on August 25, 2022. Before accepting the position at the Retina Center in April 2018, Lindley had previously worked for NMMC from June 2012 through May 2013 and May 2014 through December 2015.

Around the time Lindley returned to work at NMMC in April 2018, she started to develop mental health disorders, including recurrent major depressive disorder, personality disorders, panic disorder, and panic attacks. She testified that in June 2018 she suffered a mental health episode and cut her wrist with a piece of plastic. She sought mental health treatment at that time but did not seek leave from work. In February 2022, Lindley sought and was approved for intermittent FMLA leave related to her mental health disorders.

Despite receiving mental health treatment, Lindley continued to suffer from mental health issues. This culminated in April 2022 with Lindley purposefully cutting her wrist in multiple places with hospital needles while at work. A co-worker found Lindley with a towel wrapped over her wrist while it was bleeding. After that incident, Lindley took extended FMLA leave from April 27, 2022 through June 21, 2022.

When Lindley returned to work in late June 2022, she had a meeting with Brandy Vanstory and Doris Vanzant. To provide some background, Vanstory held the position of Practice Manager of the Retina Center. She was Lindley's immediate supervisor. Vanzant worked in NMMC's HR Department and held the position of HR Business Partner. During that meeting, Vanzant advised Lindley that if she began to experience a mental health episode, she should let someone know so that she could take time off as needed. After returning to work, Lindley intermittently took leave for her mental health disorders.

In August 2022, two similar yet distinct conversations occurred. One conversation involved only Lindley and Vanstory. During that conversation, Lindley told Vanstory about an affair that she had had in 2018. Lindley also told Vanstory that the individual with whom she had the affair told her that "he couldn't date someone that had a daughter because he might sleep with the daughter and the mother[.]" [54], Ex. 1 at p. 41. Vanstory apparently responded by telling Lindley that she did not need to have that type of extramarital relationship.

Also in August 2022, Lindley had a separate conversation with other co-workers in the back of the Retina Center. She testified that she told those employees about the prior affair but that this conversation was more vague than her conversation with Vanstory. According to Lindley, no patients were present when this conversation occurred. Unbeknownst to Lindley, Vanstory reported both of Lindley's conversations to HR.

Later in August 2022, Lindley was approved for FMLA leave for a planned hernia surgery which was scheduled for August 26, 2022. However, the day before the scheduled surgery and beginning of her FMLA leave, Lindley's employment was terminated.

Vanzant, Vanstory, and Joy Tittle, who holds the position of Director of Employee Relations, met with Lindley that day to advise her of the termination. According to Lindley, Vanzant did the bulk of the communicating during that meeting. Lindley testified that Vanzant told her NMMC was "separating employment due to behavioral standard." [54], Ex. 1 at p. 34. According to Vanzant, Lindley was terminated for "[i]nappropriate conversations in the workplace." [54], Ex. 3 at p. 12. Vanzant testified that Lindley was informed during the August 25, 2022 meeting that her employment was being terminated for "[c]onduct not in alignment with [NMMC's] behavioral standards." *Id*. at p. 19.

After filing an EEOC charge and receiving a right to sue letter, Lindley filed her Complaint [1]. She contends that NMMC violated her rights under the ADA by terminating her employment because of her mental health disorders, failing to engage in the interactive process by not offering time off work as a reasonable accommodation, and retailing against her for undergoing periodic treatments from a health care professional due to her mental health disorders. She also alleges that NMMC retaliated against her for requesting leave for her hernia surgery in violation of the FMLA.

NMMC disputes Lindley's contentions and takes the position that it fired her because she engaged in inappropriate conversations in the workplace. Through the present Motion [48], NMMC seeks dismissal of all claims.

*Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P.

56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* (quoting *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324, 106 S. Ct. 2548). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

*Analysis and Discussion*

The Court will analyze each of Lindley's claims in turn.

I.     *Disability Discrimination and Failure to Accommodate Claims*

"The ADA prohibits employers from discriminating against an employee on the basis of a disability[.]" *Rodriguez v. Eli Lilly and Co.*, 820 F.3d 759, 764 (5th Cir. 2016); *see also Clark v.*

4

*Boyd Tunica, Inc.*, 2016 WL 853529, at *2 (N.D. Miss. Mar. 1, 2016) ("The ADA prohibits an employer from discriminating against a qualified individual with a disability on the basis of that disability.") (citation and quotation marks omitted). "Discrimination includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.'" *Amedee v. Shell Chemical, L.P.*, 953 F.3d 831, 837 (5th Cir. 2020) (quoting 42 U.S.C. § 12112(b)(5)(A)). The Court will separately analyze Lindley's disability discrimination claim and her failure to accommodate claim.

A.     *Disability Discrimination Claim*

Absent direct evidence of discrimination, the familiar *McDonnell Douglas* framework is applicable to disability discrimination claims. *See*, *e.g.*, *January v. City of Huntsville*, 74 F.4th 646, 652 (5th Cir. 2023); *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009).

Under that framework, "[t]o establish a *prima facie* discrimination claim under the ADA, a plaintiff must prove: (1) that [she] has a disability; (2) that [she] was qualified for the job; and (3) that [she] was subject to an adverse employment decision on account of [her] disability." *Moss v. Harris Cnty. Constable Precinct One*, 851 F.3d 413, 417 (5th Cir. 2017) (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 697 (5th Cir. 2014)). "Once the plaintiff makes [her] *prima facie* showing, the burden then shifts to the defendant-employer to articulate a legitimate, non-discriminatory reason for the adverse employment action." *McInnis v. Alamo Comm. Coll. Dist.*, 207 F.3d 276, 280 (5th Cir. 2000). "Once the employer articulates such a reason, the burden then shifts back upon the plaintiff to establish by a preponderance of the evidence that the articulated reason was

merely a pretext for unlawful discrimination." *Id.* (citing *Daigle v. Liberty Lift Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995)).

    *i.*    *Prima Facie Case*

As to the first element, NMMC does not dispute that Lindley's mental health disorders qualify as a disability for purposes of the ADA. The first element is satisfied.

As to the second element, Lindley must show that she was qualified for her job. *See Moss*, 851 F.3d at 417. Arguing that she cannot make this showing, NMMC argues that "Lindley was not a qualified individual with a disability because she posed a direct threat to her own safety and the safety of others." [49] at p. 10. Thus, NMMC raises the direct threat defense.

"An employer is entitled to a direct threat defense if an employee poses a 'significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation.'" *Nall v. BNSF Railway Co.*, 917 F.3d 335, 342 (5th Cir. 2019) (quoting *EEOC v. E.I. Du Pont de Nemours & Co.*, 480 F.3d 724, 731 (5th Cir. 2007)). This defense "must be based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence, and upon an expressly individualized assessment of the individual's present ability to safely perform the essential functions of the job." *Id.* (quoting *Chevron U.S.A., Inc. v. Echazabal*, 536 U.S. 73, 86, 122 S. Ct. 20445, 153 L. Ed. 2d 82 (2002)). "[I]n determining whether an individual poses a direct threat, courts must evaluate the significance of the risk that an employee would pose by considering four interrelated factors: the nature of the risk, the duration of the risk, the severity of the risk, and the probability that the potential harm will occur." *Goode v. BNSF Railway, Inc.*, 2020 WL 1527864, at *6 (N.D. Tex. Mar. 20, 2020) (quoting *Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 231 (3d Cir. 2000); 29 C.F.R. § 1630.2(r) (2012)) (internal quotation marks omitted).

To support its position that Lindley posed a direct threat to herself and others, NMMC emphasizes portions of her deposition wherein she testified as follows:

> Q. Okay. You state in paragraph 5 of your Complaint that your mental health disorders keep you from or limit your ability to assure your own safety and well-being. Is that a reference to self-harm?
>
> A. Yes.
>
> . . .
>
> Q. Okay. It also states that mental health disorders impact your ability to work; is that correct?
>
> A. Yes.
>
> Q. How so?
>
> A. Like I said, when I feel like I'm separating from reality, I'll know that I'm under too much stress and I need to take off.

[48], Ex. 1 at p. 27-28.

NMMC relies on this testimony and asserts that it "makes clear that [Lindley's] mental illness poses a direct threat to herself and patient safety." [49] at p. 11-12. The Court disagrees. While Lindley recognized the existence of her mental health disorders and that they in some ways impacted her ability to work, this does not necessarily equate to her "pos[ing] a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." *Nall*, 917 F.3d at 342. Additionally, NMMC has pointed to no summary judgment type evidence as to the nature, duration, or severity of the risk nor did it provide any evidence as to the probability that the potential harm would occur. *Goode*, 2020 WL 1527864 at *6.

In other words, NMMC falls far short of establishing that there is no genuine dispute of material fact on this topic. This is a fact intensive question that the Court cannot definitively resolve at this stage of the proceedings on the presented facts. *See Rizzo v. Children's World*

*Learning Ctrs., Inc.*, 213 F.3d 209, 211 (5th Cir. 2000) ("Whether one is a direct threat to the safety of herself or others is a complicated, fact intensive question, not a question of law."). At a minimum, this is a factual issue to be resolved by a jury—not this Court at the summary judgment stage. NMMC's argument on this point is rejected.

Turning to the third element, Lindley must show that she suffered an adverse employment action because of her disability. *Ramirez v. PHI Health, LLC*, --- F. Supp. 3d ---, 2025 WL 83377, at \*5 (S.D. Tex. Jan. 13, 2025) (citing *Talk v. Delta Airlines, Inc.*, 165 F.3d 1021, 1024 (5th Cir. 1999)). Lindley undoubtedly suffered an adverse employment action—she was terminated. But she must also establish "a causal connection between [her] disability and [her] discharge." *Trcka v. Atzenhoffer Chevrolet Co., Inc.*, 2023 WL 2672818, at \*4 (S.D. Tex. Mar. 27, 2023) (citing *Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 853-54 (5th Cir. 1999); *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007)).

Comparator evidence is "one possible way to prove a nexus between the employee's disability and her termination." *Ramirez*, 2025 WL 83377 at \*5 (quoting *LHC Grp.*, 773 F.3d at 696). "If a plaintiff offers comparators to establish [her] discrimination claim, the employees must be similarly situated in *all relevant respects* to the plaintiff." *Id*. at \*7 (emphasis in original).

Lindley points to the deposition testimony of Misty Taylor, a former employee of NMMC who worked at the Retina Center, to support her comparator argument. In particular, Taylor testified that conversations of the nature in which Lindley engaged were commonplace at the Retina Center:

> Q.     I'm just trying to get a gauge of, you know, when you're at work, was the conversation strictly limited to work --
>
> A.     No.

8

Q.      -- or would it bleed over into things that were going on in your personal lives?

A.      It will bleed over into things going -- that are going on in our personal life.

Q.      Okay. And you don't have to tell me in specifics, but what kind of things that were going on in your personal lives? Are we talking about, you know, romantic relationships or kids and what your kids are doing? Like, what kind of things would you talk about?

A.      Marital problems, yes, those kind of things.

Q.      Okay. And you say marital problems. Do you remember specific conversations about marital problems?

A.      I remember Brandy [Vanstory] had a lot of issues in her marriage she would talk to us about.

Q.      Okay.

A.      I think Christina was going through some issues. I think I was going through some issues at the time. I mean, I don't remember specifics. I know Raven was going through some issues. Her and her boyfriend were having problems. We would talk about our kids. We would not talk about work when we were at lunch. We would talk more those type things.

Q.      Okay. And is this only when y'all are at lunch, or is this sometimes when y'all are at the office as well that you're talking about these things?

A.      Oh, we would talk about it at the office too, so.

. . .

Q.      . . . You mentioned that when y'all are at lunch and sometimes in the office that Brandy Vanstory might have talked about some of her marital issues. Did anybody else talk about marital issues?

A.      I'm pretty sure all of us did.

. . .

> Q.      Did anybody in HR ever come to y'all and say that y'all needed to stop talking about personal stuff in the workplace?
>
> A.      No, sir.
>
> Q.      And did you -- did you ever know of anyone to be terminated for talking about personal stuff in the workplace?
>
> A.      No, sir.

[54], Ex. 6 at p. 11-13, 20-22.

Taylor's testimony depicts a workplace wherein conversations of a similar nature to Lindley's were commonplace yet no other employees were subjected to termination. Lindley also emphasizes other points such as NMMC not complying with its own Corrective Action Policy in terminating her. The Court will address each of those points more fully when analyzing pretext but for now finds that she has carried her *prima facie* burden—a burden that the Fifth Circuit has characterized as "not onerous." *Gosby v. Apache Industrial Servs., Inc.*, 30 F.4th 523, 527 (5th Cir. 2022) (quoting *Turner v. Kansas City S. Ry. Co.*, 675 F.3d 877, 892 (5th Cir. 2012)).

####    ii.      Legitimate, Non-discriminatory Reason

Because Lindley has established a *prima facie* case, the burden shifts to NMMC to articulate a legitimate, non-discriminatory reason for its employment decision. *See McInnis*, 207 F.3d at 280. NMMC contends that it terminated Lindley because she made inappropriate comments in the workplace regarding an affair and apparent pedophilia of her paramour. This is sufficient for purposes of this stage of the proceedings.

####    iii.      Pretext

The burden shifts back to Lindley to show pretext. "Pretext is established 'either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence.'" *Delaval v. PTech Drilling Tubulars, LLC*, 824 F.3d 476, 480 (5th Cir.

2016) (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)) (additional citation and internal quotation marks omitted). "The evidence must be of sufficient weight that a 'jury could conclude that the employer's articulated reason is pretextual.'" *EEOC v. Modern Group, Ltd.*, 725 F. Supp. 3d 577, 634 (E.D. Tex. 2024) (quoting *Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017)) (additional citations omitted).

The Court previously addressed disparate treatment in connection with Lindley's *prima facie* burden. As noted there, a former NMMC employee, Misty Taylor, testified that personal conversations concerning marital issues were commonplace at the Retina Center and that she was unaware of any employee ever receiving any disciplinary action—much less termination—for engaging in such conversations. Taylor testified that Vanstory herself frequently participated in the conversations.

In addition to disparate treatment, Lindley also argues that she has presented evidence indicating that NMMC's proffered reason is false. She points to NMMC's Corrective Action Policy and contends that NMMC failed to follow it when terminating her. That policy contains three corrective action categories which increase in severity from Group One to Group Three.

For a Group One offense, the first occurrence warrants a documented verbal coaching, the second occurrence warrants a documented written warning, and the third occurrence warrants separation from employment. Among other things, an example of a Group One offense listed in the Corrective Action Policy is "behavior disruptive to co-workers, patients, visitors or volunteers." [54], Ex. 8 at p. 4.

A Group Two offense warrants a written warning for the first occurrence and termination for the second occurrence. Examples of a Group Two Offense are, among other things, "failing to report injuries, damage to or an accident involving company equipment," "violating any safety

rule," "acting negligently," and "engaging in vulgar, malicious or abusive language or conduct toward others." *Id*. at p. 5.

Group Three offenses are the most serious and warrant termination for the first offense. The Policy states that "occurrences in this group include serious breaches of responsibility, unsatisfactory performance or misconduct." *Id*. Listed examples include "physical altercation or fighting," "demonstrating insubordination," "refusal to do an assigned job," and "engaging in indecent behavior," among other things. *Id*. at p. 5-6.

During her deposition, Vanstory testified that Lindley's conduct "disrupted the workflow." [54], Ex. 2 at p. 31. Lindley contends that a disruption to the workflow more appropriately falls within Group One of the Corrective Action Plan as "behavior disruptive to co-workers, patients, visitors or volunteers." [54], Ex. 8 at p. 4. When pressed on this topic, Tittle testified that the HR Department maintains discretion as to which category certain conduct falls within. Indeed, the Plan itself specifically provides that "[e]ach situation will be dealt with on an individual basis." *Id*. at p. 3. However, this Court has recently recognized that an employer's deviation from its written policy may raise an inference of pretext. *See Huddleston v. Cooper Tire & Rubber Co.*, 2024 WL 1315853, at *8 (N.D. Miss. Mar. 27, 2024) (citing *Martin v. Waring Invs., Inc.*, 2008 WL 2312728, at *4 (S.D. Miss. May 30, 2008)). Whether NMMC actually deviated from its Policy is beyond the purview of this Court and is instead a question for the jury. And should the jury conclude that NMMC did deviate from the policy, it could also conclude that NMMC's articulated reason for the termination is pretextual.

Furthermore, the Court notes that Vanstory was unable to explain how Lindley's comments actually disrupted the Retina Center's workflow:

> Q.    And how did that affect her job?

A.      It disrupted the workflow discussing the inappropriate comments.

Q.      How did it disrupt it?

A.      Because they were talking -- discussing the inappropriate comments at work.

Q.      So they're just not allowed to talk at work at all?

A.      They can talk but not inappropriately.

Q.      Okay. But I'm trying to figure out how it disrupted the workflow. And you've just said they were talking. So did it do -- [was] it anything other than them talking?

A.      The showing the pictures and stopping -- stopping and telling other co-workers.

Q.      Gotcha. You said that you've seen other people show pictures in the workplace though.

A.      Yes.

. . .

Q.      Oh, so there was a delay in getting patients back?

A.      From -- if you stop and talk there is a delay in patients turnaround.

Q.      Would it delay getting patients back if they were talking about their lunch?

A.      I'm assuming, yes.

. . .

Q.      Okay. And so wouldn't it be fair to say that this was a normal disruption as any conversation or any showing of pictures would cause in the workplace?

A.      No.

Q.      And why is that?

13

> A. Because it was inappropriate discussions in the workplace.

[54], Ex. 2 at p. 31-34.

As this excerpt makes clear, Vanstory continually stated that the conversations were inappropriate but never articulated how they disrupted the workflow any differently than a normal conversation would have. This testimony is particularly telling when considered in conjunction with Taylor's testimony that employees in the Retina Center frequently talked about numerous aspects of their personal lives during the workday.

Finally, the Court notes that Vanzant testified that normally HR would involve the supervisor (internally referred to as the "leader") to be a part of the discussion as to corrective actions:

> Q. Okay. If Brandy had recommended some lesser action than termination, would y'all have taken Brandy's word on that?
>
> A. A leader is a thought partner, so *we always want them to be a part of it and a part of the conversation, the discussion. So we would definitely take into consideration everything she - - she would bring forward*. But, again, before any recommendation is made, it's thought through thoroughly.

[54], Ex. 3 at p. 16 (emphasis added).

Despite Vanzant's testimony on this point, Vanstory testified that she was not made part of the discussion as to the appropriate corrective action to be taken against Lindley:

> Q. And so at either time when you reported this to HR, did you make a recommendation about what corrective action they could take -- they should take?
>
> A. I did not.
>
> Q. So you didn't ask for Christina to be terminated?
>
> A. No.
>
> Q. Did they ask you for what you thought should happen?

14

A.      No.

[54], Ex. 2 at p. 26-26.

Thus, while Vanzant testified that NMMC typically consults with supervisors before making a corrective action decision, Vanstory denied being a part of the conversation with HR. She testified that she learned of Lindley's termination at the same time Lindley did. *See* [54], Ex. 2 at p. 27. This inconsistency, particularly when coupled with the other discrepancies noted herein, could lead a jury to infer pretext.

Ultimately, viewing all of these matters in the light most favorable to Lindley, there is sufficient evidence from which a jury could conclude that NMMC's articulated reason for Lindley's termination was pretextual. Summary judgment is therefore inappropriate as to this claim.

B.      *Failure to Accommodate*

Lindley also brings a failure to accommodate claim. As noted previously, "discrimination includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.'" *Amedee*, 953 F.3d at 837 (quoting 42 U.S.C. § 12112(b)(5)(A)). To prevail on a failure to accommodate claim, "a plaintiff must prove the following statutory elements . . .: (1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations." *Id*. (quoting *Feist v. La., Dep't of Justice, Office of the Attorney Gen.*, 730 F.3d 450, 452 (5th Cir. 2013)) (quotation marks omitted).

15

As to the first element, NMMC again raises the direct threat defense, arguing that Lindley posed a direct threat to herself and others and therefore was not qualified for her job. The Court sees no need to again recite the inadequacies of NMMC's position on this point. But for the same reasons set forth previously in connection with the discrimination claim, the Court rejects this argument.

The second element concerns NMMC's knowledge of Lindley's disability and its consequential limitations. There is no dispute that NMMC had such knowledge. The second element is satisfied.

The crux of the parties' dispute as to this claim is the third element—whether NMMC made reasonable accommodations for Lindley's disability. NMMC says that it did. Lindley disagrees.

"EEOC regulations promulgated to implement the ADA define 'reasonable accommodation' as 'modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position.'" *Chevron Phillips*, 570 F.3d at 620-21 (quoting 29 C.F.R. § 16320.2(o)(1)(ii)).

NMMC takes the position that it accommodated Lindley's disability by allowing her to take leave as necessary for mental health treatment. For instance, Lindley admits that she was approved for intermittent leave as needed from February 2022 through January 2023 for "personality disorders, recurrent major depressive order and panic attacks and panic disorder." *See* [54], Ex. 1 at p. 27. After Lindley cut her wrist at work in April 2022, Vanstory suggested that Lindley seek direct help from a counselor. Lindley did so and took leave from April 27, 2022 through June 21, 2022.

When Lindley returned to work in June 2022, she met with Vanzant and Vanstory. When questioned about that meeting during her deposition, Lindley agreed that Vanzant "told [her] that if [she] started to feel bad or thought that [she] had an issue coming, let them know so that they could make sure [she] obtained the time off [she] needed[.]" *Id*. at p. 32.

Despite these admissions, Lindley argues in her Response Memorandum [55] that the accommodations "were continually frustrated and denied to her, even if they were allowed at times." [55] at p. 15. To support her position, Lindley relies on several portions of her deposition testimony. When questioned about her requests to leave work, she testified "I was told no on multiple occasions, that I could not leave work to go to my counselor, or have my -- or asked -- or I was asked to reschedule." [54], Ex. 1 at p. 68. She then testified about a specific instance on the day that she cut her wrist in April 2022:

> Q. Okay. I just want to make sure I'm clear because it sounds like you clarified that. But no one told you you couldn't take time off for your appointments or have time. You were asked to schedule them at a different time that better accommodated scheduling at the Retina Center?
>
> A. I needed immediate help, and they did not allow me to go.
>
> Q. And on what occasion did you need immediate help where you were not allowed to leave immediately?
>
> A. When I cut my wrist.
>
> Q. Who was aware that you had cut your wrist and told you you couldn't leave?
>
> A. Well, after I'd done did the fact, she told me to go after that. But, I mean --
>
> Q. So when she found out that you had cut your wrist --
>
> A. Yeah. She -- she knew that I needed to go.

17

> Q.     Okay. And prior to you cutting your wrist, had you asked to leave that day.
>
> A.     *I can't honestly say because it's been so long.*

*Id*. at p. 68-69 (emphasis added).

As this excerpt illustrates, Lindley testified that she was not permitted to leave work early that day; however, when pressed on the issue, she admitted to having no recollection of specifically requesting to do so. That admission is fatal to this aspect of the claim. *See Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (5th Cir. 2011) ("An employee who needs an accommodation because of a disability has the responsibility of informing her employer.") (quoting *Chevron Phillips*, 570 F.3d at 621). To the extent Lindley's claim is based on NMMC's failure to accommodate her on this particular day, her claim fails.

Lindley was then questioned about other instances when she requested leave. Although lengthy, this portion of her deposition is critical to this claim:

> Q.     Okay. Other than that occasion, was there any occasion where you were told you couldn't leave immediately?
>
> A.     Not immediately.
>
> . . .
>
> Q.     So when you would ask to leave a shift, you ultimately would be allowed to leave earlier than normal?
>
> A.     No. We had to put it in the book to be able to leave. I mean, we -- I mean, it's like we couldn't leave. We can't abandon our patients.
>
> . . .
>
> Q.     And so as I understand it, it wasn't that North Mississippi was telling you, No, you can't go; but you had to finish [whatever] task needed for the --- take care of the patient and then you could leave early? Is that right?

18

A.      No. I mean, I could not leave early.

Q.      Okay.

A.      Like, I could not leave.

Q.      All right. And that wasn't because someone was telling you no; it was because you had patient obligations?

A.      Yes.

. . .

Q.      . . . It wasn't North Mississippi telling you no. It was your obligation -- your personal feeling about feeling obligated to not leave the patients.

A.      Well, I mean, they would tell me that I couldn't go.

Q.      Okay. And who is "they"?

A.      Brandy [Vanstory].

Q.      Okay. And the reason she gave was there were patient needs at the time?

A.      Yeah. We're understaffed.

Q.      Understaffed. Okay. And so when I asked about accommodation, the other thing you mentioned, I believe, was that there were times where you were asked to reschedule your mental health appointments to accommodate the work schedule.

A.      Yeah. I -- I needed to go every week.

Q.      Uh-huh.

A.      I was required -- or my counselor and psychiatrist suggested I go every week. And she would ask to, like, not reschedule a day; rescheduled, like, a week or such later. And it just -- I needed it every day -- every week.

. . .

19

Q.  Okay. And were there times where North Mississippi adjusted the schedule so that you could make those appointments?

A.  No.

Q.  Well, did you make those appointments?

A.  I still made my appointments.

Q.  Okay. When did you make them? Different days, different times?

A.  Yes.

Q.  Okay. So did you -- did you ever actually miss an appointment?

A.  Yes.

. . .

Q.  Okay. But besides those instances, there were times where you were allowed to leave to attend those appointments?

A.  Yes, I was.

[54], Ex. 1 at p. 69-74.

Taken as true, Lindley's deposition testimony depicts a reality where she was sometimes granted an accommodation to leave work to attend mental health therapy sessions and other times not permitted to leave.

The Court is cognizant that "the law contemplates a dialogue between employees and their employers regarding the scheduling of medical treatment." *Villegas v. Albertsons, LLC*, 96 F. Supp. 3d 624, 635 n. 5 (W.D. Tex. 2015) (citing 29 C.F.R. § 825.302(e)). In fact, the regulation itself provides that "[w]hen planning medical treatment, the employee must consult with the employer and make a reasonable effort to schedule the treatment so as not to disrupt unduly the employer's operations, subject to the approval of the health care provider." 29 C.F.R. § 825.302(e).

20

Here, though, there is no dispute that NMMC was aware of Lindley's mental health condition. In fact, the parties agree that Vanstory and Vanzant specifically met with Lindley in June 2022 and advised her to let them know if she needed to leave work to attend mental health treatment. And Lindley testified that there were times that, despite NMMC's knowledge of her need to attend treatment, she was not permitted to leave work to attend them. For its part, NMMC has not pointed to any competent summary judgment type evidence to indicate that its operations would have been unduly disrupted if Lindley had been permitted to leave or that Lindley's requests were otherwise unreasonable.

Therefore, for purposes of the present stage of the proceedings, NMMC is not entitled to judgment in its favor. Lindley will be permitted to proceed to trial on her failure to accommodate claim, except for the aspect of it pertaining to the April 2022 incident. In all other respects, summary judgment is denied.

## II.     *Retaliation Claims*

Lindley asserts retaliation claims pursuant to the FMLA and the ADA. In their filings, the parties to some extent address these claims jointly as the claims concern much of the same evidence. As discussed previously, because of her disability, Lindley took FMLA leave on multiple occasions leading up to her termination on August 25, 2022. She was also scheduled to begin FMLA leave for hernia surgery on August 26, 2022.

The *McDonnell Douglas* burden shifting framework is applicable to both claims. *See Feist*, 730 F.3d at 454 (explaining that the *McDonnell Douglas* framework is applicable to ADA and Title VII retaliation claims); *Martin v. Penske Logistics, LLC*, 736 F. Supp. 3d 437, 453-54 (N.D. Tex. 2024) (applying *McDonnell Douglas* framework when analyzing an FMLA retaliation claim).

To establish a *prima facie* case of retaliation under the ADA, a plaintiff must establish three elements: "(1) she participated in an activity protected under the statute; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse action." *Feist*, 730 F.3d at 454 (citing *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999)); *see also Wheat v. Fla. Parish Juvenile Justice Comm'n*, 811 F.3d 702, 705 (5th Cir.2016) (listing same elements for *prima facie* case for FMLA retaliation). The burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for its decision. *Id*. "After the employer states its reason, the burden shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation, which the employee accomplishes by showing that the adverse action would not have occurred 'but for' the employer's retaliatory motive[.]" *Id*. (quoting *LeMaire v. Louisiana*, 480 F.3d 383, 388-89 (5th Cir. 2007); citing *Seaman*, 179 F.3d at 301). Importantly, "[i]n order to avoid summary judgment, the plaintiff must show 'a conflict in substantial evidence' on the question of whether the employer would not have taken the action 'but for' the protected activity." *Id*. (quoting *Long v. Eastfield College*, 88 F.3d 300, 308 (5th Cir. 1996)).

Beginning with the *prima facie* case, there is no dispute that Lindley engaged in a protected activity—she requested, and was approved for, FMLA leave. She was also subjected to an adverse employment action—she was terminated.

The third element is disputed. NMMC contends that its "approval of Ms. Lindley's **seven** previous FMLA leave requests throughout her ten year tenure without any issues belies the assertion that NMMC now arbitrarily decided to retaliate against Ms. Lindley for preparing to take FMLA leave for her hernia surgery and/or having previously taken FMLA leave." [49] at p. 7.

22

The Fifth Circuit has held that "[a] plaintiff alleging retaliation may satisfy the causal connection by showing close timing between an employee's protected activity and an adverse action against him." *Feist*, 730 F.3d at 454 (citation omitted). Here, the temporal proximity was close. Although NMMC correctly asserts that Lindley took FMLA leave throughout her tenure as an employee (spanning several years), she also took leave on multiple occasions in the months immediately preceding the termination. Specifically, she took extended FMLA leave from April 27, 2022 through June 21, 2022 and then took intermittent FMLA leave leading up to her termination on August 25, 2022. She was even scheduled for FMLA leave the day following her termination. This is sufficient for *prima facie* purposes. *See*, *e.g.*, *Berry v. Tex. Woman's Univ.*, 528 F. Supp. 3d 579, 607 (E.D. Tex. 2021) (citing *Besser v. Tex. Gen. Land Office*, 834 F. App'x 876, 884 (5th Cir. 2020)).[1]

The burden then shifts to NMMC. It contends that it terminated Lindley because she engaged in appropriate conversations in the workplace. Again, this is sufficient for purposes of this stage of the proceedings.

The burden then shifts back to Lindley to show pretext. Notably, "[f]or ADA retaliation claims, the causal standard is stricter than it is for discrimination claims: the plaintiff must show 'that the adverse action would not have occurred "but for" the employer's retaliatory motive.'" *Cruz v. R2Sonic, LLC*, 405 F. Supp. 3d 676, 694 (W.D. Tex. 2019) (quoting *Feist*, 730 F.3d at 454; citing *Seaman*, 179 F.3d at 301). The causation standard is not as certain as to FMLA retaliation

---

[1] The Court acknowledges that there is some disagreement as to how close the protected activity and the adverse employment action must be in order for temporal proximity alone to satisfy the *prima facie* standard. *See Besser*, 834 F. App'x at 884. However, the Court need not definitively decide the outer boundaries of the temporal proximity requirement since the temporal proximity in this case is so close. For instance, Lindley took intermittent leave from the time she returned to work in late June 2022 until her termination on August 25, 2022. And as noted above, she was scheduled to take FMLA leave on August 26, 2022.

claims. *Compare Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 334 (5th Cir. 2005) (holding that mixed motives causation standard applies) *with Stanton v. Jarvis Christian Coll.*, 2022 WL 738617, at *6 (5th Cir. Mar. 11, 2022) (noting intervening Supreme Court precedent and concluding that "we need not, and do not, decide whether Nassar's analytical approach applies to FMLA-retaliation claims and, if so, whether it requires a plaintiff to prove but-for causation."). For purposes of the present Motion [48], though, this distinction is immaterial because Lindley can satisfy either standard.

The Court has already addressed pretext in connection with Lindley's disability discrimination claim and sees no need to recite that analysis in full again. However, the Court specifically finds that the reasons analyzed previously, along with the close temporal proximity between Lindley's protected activities and her termination, is sufficient to preclude summary judgment.

Arguing in opposition, NMMC relies heavily on the fact that it previously approved Lindley's FMLA leave requests. Although this is certainly probative evidence upon which a jury could rely in finding in NMMC's favor, it is insufficient to warrant judgment as a matter of law.

A reasonable jury could conclude that NMMC's proffered reason is a pretext for retaliation. Summary judgment is therefore not warranted on Lindley's retaliation claims.

*Conclusion*

For the reasons set forth above, NMMC's Motion for Summary Judgment [48] is GRANTED IN PART and DENIED IN PART. It is GRANTED as to Lindley's failure to accommodate claim to the extent it factually concerns the date she cut her wrist in April 2022. In all other respects, the Motion [48] is DENIED.

SO ORDERED, this the 9th day of April, 2025.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE